**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION**


**DEXTRIC WILLIAMS, INDIVIDUALLY AND
ON BEHALF OF THE HEIRS-AT-LAW/
WRONGFUL DEATH BENEFICIARIES OF
JERMAINE WILLIAMS, DECEASED**                                           **PLAINTIFF**


**v.**                                          **CAUSE NO.: 2:10cv215-SA-JMV**


**CITY OF CLEVELAND, MISSISSIPPI; ET AL.**                 **DEFENDANTS**


## MEMORANDUM OPINION

This action arises out of an incident occurring in the early morning hours of July 23, 2010, between Jermaine Williams, now deceased, and officers from the City of Cleveland Police Department. Officers from the City of Cleveland Police Department deployed Taser Electronic Control Devices (ECDs) on Jermaine Williams and, according to Plaintiff Dextric Williams, the brother of Jermaine Williams, this caused Jermaine Williams to suffer cardiac arrhythmia and/or respiratory seizures resulting in his death. Plaintiff Williams has now filed the instant action against the City of Cleveland, Taser International, Inc., Officer Stanley Perry, and Officer Bryan Goza.

Currently before the Court are numerous motions filed by all Defendants. First, Taser International, the manufacturer and seller of Tasers to law enforcement agencies, has filed five Motions to Strike [114, 116, 118, 120, 150] various experts designated by Plaintiffs as well as evidence presented in response in opposition to summary judgment. Second, Taser

has filed a Motion for Summary Judgment [122] as to Plaintiff's product liability claims asserted against it. Third, Officers Stanley Perry and Bryan Goza have filed a motion for summary judgment [127], asserting they are entitled to qualified immunity. Fourth, the City of Cleveland and Officers Perry and Goza, in their official capacities, have filed a motion for summary judgment [129], asserting they are entitled to judgment as a matter of law. Fifth, Plaintiffs have filed a motion for reconsideration [166] as to the Court's prior Order [145] on Plaintiff's motion to transfer trial of this case to Greenville. After marshaling through the summary judgment record, carefully considering the arguments articulated during a hearing held in this matter, and reviewing the pertinent authority, the Court concludes that the Defendants' motions for summary judgment [122, 127, 129] shall be granted and this case dismissed without reaching the merits of the other motions filed in this case.

## FACTUAL BACKGROUND

Between 3:15 and 3:30 a.m. on July 23, 2010, Cleveland Police Officers Bryan Goza, Stanley Perry, Michael Mengarelli, and Leigh Ann Weeks responded to a loitering call. Apparently, upon arrival, several men, including Jermaine Williams, were gathered either in the yard or in the street around a Chevy Suburban. Officer Perry discovered two plastic baggies on the SUV's luggage rack that he believed to—and were later confirmed to—contain crack cocaine. Shortly thereafter, the owner of the SUV and another individual who provided a false name to the officers were placed in handcuffs. While detaining these individuals, it is alleged that Jermaine Williams ran up to and jumped on the vehicle, grabbed the baggies, and took off running. A foot chase then ensued. Officers Perry, Goza, and Weeks initially began chasing Williams on foot. However, Officer Goza apparently informed Officer Weeks to stay

with Officer Mengarelli and the two detained men. Officer Goza maintains that he then set off again to back up Officer Perry.

Jermaine Williams continued running down the street and ran the length of the block before turning into a backyard and running around a house. Officer Perry appears to have cut Jermaine Williams off as he came out on the other side of the house. Officer Perry yelled at Jermaine Williams to stop, and told Williams that if he did not stop, he would use his Taser ECD. Williams continued to run towards Officer Perry; thus, Officer Perry deployed his Taser ECD in probe mode striking Williams "[s]omewhere in the chest area." Williams either fell backwards or slipped,[1] and Officer Perry was able to catch up to Williams. A physical struggle followed, and it appears that Williams grabbed Officer Perry's Taser and disarmed him.[2] Officer Goza testified that he saw Williams and Officer Perry "struggling" on the ground, and he therefore deployed his Taser ECD in probe mode into Williams' back. Because Williams appeared unaffected by the Taser ECD's charge and continued to struggle, Officer Goza "followed up with an ECD drive-stun to Williams' upper arm in an attempt to widen the probe spread and achieve a better effect." After this, Officer Goza maintains that Williams was still unfazed.

According to Officer Goza, after being tased, Williams just looked at him and tried to take the Taser out of his hand. Officer Goza contends that he rolled Williams onto his

---

[1] Officer Perry asserts that the Taser "appeared to do nothing to [Williams]." Perry maintains, after being tased, Williams, did an "about-face, turned or turned around and took off running again . . . back through between the houses and the bushes. And at that time is when Mr. Williams fell between the bushes and the house." Officer Goza stated that he saw Williams fall backwards.

[2] At some point during the struggle or the chase, the wires connecting the Taser ECD cartridge's probes to Officer Perry's ECD became separated.

stomach and fell on his back to pin him down. Officer Perry appears to have then laid on top of Officer Goza in an effort to keep Williams on the ground. Williams continued to resist and, according to the officers, Williams "did push-ups" with both officers on his back. Officer Perry used Officer Goza's radio to call for backup, and eventually the officers were able to pull Williams' arms out from underneath him, and Officer Perry handcuffed Williams. Sometime after Williams was handcuffed, Officer Perry instructed him to get up. It was then that Officer Goza noticed that Williams had become unresponsive. Shortly thereafter, Williams was rolled over and Officer Goza determined that Williams' breathing had ceased and a pulse could not be detected. The officers called an ambulance and started CPR on Williams. Paramedics arrived and took over the CPR. Williams was put on a stretcher and moved to the ambulance. All efforts to revive Williams were unsuccessful and he was pronounced dead at 4:26 a.m. at Bolivar Medical Center.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.[3] The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

---

[3] The Court feels compelled to point out to the parties that effective December 1, 2010, Rule 56 has been amended, and the summary judgment standard is now reflected in Rule 56(a), not 56(c). Rule 56(a) now states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002); <u>SEC v. Recile</u>, 10 F.3d 1093, 1097 (5th Cir. 1997); <u>Little</u>, 37 F.3d at 1075.

## **ANALYSIS AND DISCUSSION**

A. Products Liability Motion for Summary Judgment Filed by Taser International[4]

---

[4] Before the Court turns to the merits of this action, the Court addresses an issue raised by Plaintiff through a supplemental response to his opposition to summary judgment. In Plaintiff's supplemental response, he relies on a paper recently published by Douglas Zipes, M.D. First, the Court notes that Plaintiff's supplemental response is untimely. Second, Dr. Zipes is not an expert in this case. Third, Plaintiff has not sought to supplement his own

***Design Defect***

To establish a prima facie design defect claim in Mississippi, the plaintiff must

> . . . prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller . . .

> (i)      The product was designed in a defective manner . . . and

> (ii)    The defective condition rendered the product unreasonably dangerous to the user or consumer; and

> (iii)   The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Miss. Code Ann. § 11–1–63(a).

The plaintiff must also prove

> the product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

Miss. Code Ann. § 11–1–63(f); see also Wolf v. Stanley Works, 757 So. 2d 316, 322 (Miss. Ct. App. 2000) (noting that in order to prove a design defect claim, "the Mississippi Products Liability Act requires the plaintiff to show that there existed a feasible design alternative that would have to a reasonable probability prevented the harm" without "impairing the utility,

---

expert's (Dr. Mark Seifert's) opinions or report based on Dr. Zipes' publication. Due to this, the Court finds that the paper is improper summary judgment evidence, as it is untimely and inadmissible hearsay. Fourth, as made clear during the oral argument in this case, the Dr. Zipes paper provided by Plaintiff is not the corrected and final version. Fifth, the paper does not even apply to the type of Taser ECD deployments involved in the present action. Sixth, even if the Court were to consider the paper at the summary judgment stage, it would not alter the Court's decision as it relates to the granting of Defendants' motions for summary judgment.

usefulness, practicality or desirability of the product to users or consumers") (internal quotations omitted).

In this case, Plaintiff has not demonstrated, or even alleged, that a feasible design alternative exists that would have prevented the harm without impairing the "utility, usefulness, practicality or desirability" of Taser's ECD product.  See Patterson v. Taser Int'l, Inc., 2011 WL 3489858, at *3 (N.D. Miss. Aug. 9, 2011).  Plaintiff also has failed to set forth briefing addressing a "design defect" claim.  See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.");  In re Cao, 619 F.3d 410, 435 (5th Cir. 2010) (noting that the role of the Court is "not to create arguments for adjudication" or "raise [them] like a Phoenix from the ashes[,]" but "rather, [the Court's] role is to adjudicate the arguments with which [it is] presented"); Williams v. Valenti, 432 F. App'x 298, 303 (5th Cir. 2011) (noting that the district court is "not required to search the record in support of evidence supporting a party's opposition to summary judgment"). Plaintiff has failed to present proof that the product at issue was designed in a defective manner; thus, Defendant's motion for summary judgment as to this claim is granted.

### Manufacturing Defect

To establish a prima facie manufacturing defect claim in Mississippi, the plaintiff must

> prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller . . .
>
> (i)    The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications . . . and

(ii)     The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii)    The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Miss. Code Ann. § 11–1–63(a). "[E]xpert testimony is generally necessary to prove a product was defective at least as to design and manufacture under section 11-1-63." McIntosh v. Nissan North America, Inc., 2008 WL 4793743, at *3 (S.D. Miss. Oct. 28, 2008) (citing Hammond v. Coleman Co., Inc., 61 F. Supp. 2d 533. 542 (S.D. Miss. 1999)). Moreover, under Mississippi law, the mere fact of an accident or injury is not sufficient to prove a product defect. Wolf, 757 So. 2d at 321 (Miss. Ct. App. 2000); McIntosh, 2008 WL 4793743, at *3.

Here, Plaintiff has not disclosed any expert opinion specifically addressing whether the Taser ECDs at issue deviated in a material way *from Taser's specifications or from otherwise identical units*. Instead, Plaintiff only maintains that "the testimony of the Defendants establishes that at least one of the electronic weapons used in this matter produced output in excess of 25,000 volts per wire." According to Plaintiff, because the individual Defendant police officers testified that that they felt electricity after deploying the Taser ECDs, it must mean that the Taser was producing voltage in excess of what Taser's expert stated was 50,000 volts. Plaintiff has produced no expert opinion establishing this. Nor has Plaintiff produced anything other than speculation that the "stinging" Office Goza felt was in fact due to the degradation of the Taser wire insulation, or any other manufacturing defect. Accordingly, because Plaintiff has failed to carry its burden, Defendant's motion for summary judgment is granted.

***Failure to Warn***

To make out a cognizable warning defect claim under the MPLA, a plaintiff must prove by a preponderance of the evidence "that at the time the product left the control of the manufacturer . . . it failed to contain adequate warnings or instructions;" that this "defective condition rendered the product unreasonably dangerous to the consumer;" and that this "defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought." MISS. CODE ANN. § 11–1–63(a)(i)–(iii). The MPLA further provides:

> In any action alleging that a product is defective because it failed to contain adequate warnings or instructions ..., the manufacturer ... shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer ..., the manufacturer ... knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

MISS. CODE ANN. § 11–1–63(c)(i). Also:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product. . . .

MISS. CODE ANN. § 11–1–63(c)(ii). Finally:

> [T]he manufacturer . . . shall not be liable if the danger posed by the product is known or is open and obvious to the user or consumer of the product, or should have been open and obvious to the user or consumer of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product.

MISS. CODE ANN. § 11–1–63(e).

Plaintiff's complaint alleges that Taser sold its ECDs "without adequate warning of or training in its potential for causing death and great bodily injury" and "without warnings as to the effect of multiple shocks, the danger of shocking people under the influence of drugs or otherwise, and the effects of [TASER ECD] shocks on respirations." However, Taser's product warnings in effect at the time of the training for the device used in this action explicitly and repeatedly warned of the risks of serious injury or death. See Austin v. Will–Burt Co., 361 F.3d 862, 869–70 (5th Cir. 2004) (where product contained warnings which specifically addressed the adverse effect of which plaintiff complained, summary judgment was appropriate). For example, the warnings at issue in this instance expressly warned of the risk of death associated with ECD incapacitation:

> Confronting, apprehending, capturing, controlling, restraining, **incapacitating**, and taking persons into custody **are high risk events that could result in death** or serious injury. When lawfully used as directed, ECDs are designed in probe-deployment mode to temporarily incapacitate a person from a safer distance than some other force options, while reducing the likelihood of death or serious injury. Any use of force, physical exertion, capture, control, restraint, or **incapacitation involves risks that a person may get hurt or die**.

Plaintiff's claims concerning Taser's warnings, however, also surround allegations that Taser failed to warn officers not to target the chest area when deploying their Taser ECDs. Plaintiff relies on the fact that two individual officers contended in their deposition testimony that they were not trained to not deploy their Taser ECDs in the chest area. The Court begins by noting that Taser does not claim that their warnings state that officers should never, under any circumstances, deploy Taser ECDs in the chest area.[5] Taser, as a

---

[5] Plaintiff makes the argument that Taser "recanted" its warnings concerning chest area Taser deployment. Such an argument is unfounded. Taser published a document answering questions concerning chest area Taser ECD deployment. In answering a question

manufacturer, does not make such field-related policy decisions. Plaintiff has presented no competent summary judgment evidence, much less expert testimony supporting such evidence, demonstrating that the warnings Taser provides concerning chest area Taser ECD deployment are inadequate. In fact, Taser indeed does expressly warn to *avoid* targeting the chest *whenever possible*:

> **Sensitive Body Part Hazard**
> When possible, avoid intentionally targeting the ECD on sensitive areas of the body such as the head, throat, *chest/breast*, or known pre-existing injury areas without legal justification. The preferred target areas are the lower center mass (*below chest*) for front shots and below the neck area for back shots.

Taser also warned officers that "[f]ailure to comply with these instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the User, force recipient, and others." Taser's Version 16 user course PowerPoint® presentation similarly and graphically recommended "lower torso" applications to avoid the chest. Moreover, Taser's warnings warned against the use of multiple ECD applications:

> **Minimize Repeated, Continuous, or Simultaneous Exposures**
> Reasonable efforts should be made to minimize the number of ECD exposures. ECD Users should use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives and should reassess the subject's resistance level before initiating or continuing the exposure.

Officers were also instructed to "control and restrain immediately" in order to "minimize total ECD exposure."

---

related to such chest area deployment, Taser essentially indicated that an officer can deploy his or her Taser ECD in the chest area. This answer does not amount to "recantation" of Taser's warnings. In fact, it is consistent with such warnings. That is, Taser's warnings state to "avoid" such an area "when possible"; the warnings do not prescribe an absolute prohibition on deploying the Taser ECD to a sensitive body part such as the chest/breast area. The warnings merely provide "preferred target areas."

The Officer Defendants in this case became certified Taser X26 ECD users in February 2010, after completing a training course at the Cleveland Police Department conducted by Gulfport Sargent Paul Podlin.  Podlin is not an employee or representative of Taser, but as a Taser-certified Master ECD Instructor was authorized to use Taser's copyrighted training materials under a license agreement. Podlin, as required, presented Taser's Version 16 X26 ECD User Certification Course in its entirety.  Podlin also distributed and discussed Taser's September 30, 2009 Law Enforcement Product Warnings, and the trainee officers were required to read and sign a liability release containing comprehensive warnings and risk information prior to the training. Plaintiff has presented no competent summary judgment evidence suggesting this did not occur, and Taser's warnings in effect at the time the individual Defendant officers received Taser ECD training in February 2010 specifically warned of the risks complained of by Plaintiff.

Similarly, there is *no* evidence presented by Plaintiff that additional or different warnings would have altered the officers' use of the Taser ECDs under the factual circumstances presented in this case.  See 3M Co. v. Johnson, 895 So. 2d 151, 166 (Miss. 2005) (where plaintiffs failed to prove that some other warning would have given them information they did not already know *and* that they would have acted upon that information in a manner that would have avoided injury, manufacturer was entitled to judgment as a matter of law); Hobson v. Waggoner Eng'g, Inc., 878 So. 2d 68, 79 (Miss. Ct. App. 2003) (where evidence indicated that warning was sufficient and that the dangerous nature of the product was open and obvious to the user, summary judgment was appropriate); Wolf, 757 So. 2d at 322–23 (where plaintiff failed to present evidence that her desired warning would

have had any causative impact, summary judgment in favor of manufacturer was appropriate); see also Rosa v. Taser Int'l, Inc., 2012 WL 2775006 (9th Cir. July 10, 2012) (affirming the grant of summary judgment to Taser International in a failure to warn claim alleging that Taser failed to warn that repeated exposure to its products could lead to fatal levels of metabolic acidosis).  Thus, there is no evidence that the alleged failure to warn was a proximate cause of the injuries suffered.  Accordingly, Plaintiff has failed to demonstrate that Taser's warnings were inadequate, and summary judgment is therefore appropriate.

B.  Motion for Summary Judgment Based on Qualified Immunity

Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right. Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003). The defendant must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Bazan v. Hidalgo Cnty, 246 F.3d 481, 489 (5th Cir. 2001). Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. Id.  A claim of qualified immunity requires the court to engage in a two-step analysis. The court determines whether the defendant has violated an actual constitutional right, see McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002), and if the answer is "no," the analysis ends. Freeman v. Gore, 483 F.3d 404, 410-11 (5th Cir. 2007). If the answer is "yes," then the court considers whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. Id. at 411. Prior to January 2009, this two-step process was a mandatory sequential analysis, meaning that courts were required to first analyze "step one" – the constitutional violation

question – before moving to "step two." <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *overruled in part by* <u>Pearson v. Callahan</u>, 555 U.S. 223, ---, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The mandatory nature of this sequential analysis was undermined in <u>Pearson v. Callahan</u>, in which the Court held that while courts may analyze qualified immunity by engaging in the <u>Saucier</u> "two-step" analysis described above, they are not required to do so and may skip the first question entirely and instead begin by determining whether the conduct was objectively reasonable under clearly established law. 129 S. Ct. at 818. This immunity defense gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. <u>Mendenhall v. Riser</u>, 213 F.3d 226, 230 (5th Cir. 2000) (citations omitted).

Over the years, the doctrine of qualified immunity has endured considerable transformation. After the Supreme Court's recognition of a right of action for constitutional torts under <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388, 397, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), the Supreme Court began developing this defense of qualified immunity to protect federal employees against liability for, and the burden of defending themselves against, alleged violations of constitutional rights. As first formulated in <u>Butz v. Economou</u>, 438 U.S. 478, 495-98, 507, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978), qualified immunity had both an objective and subjective element: the federal official was entitled to immunity if there were reasonable grounds to believe that the challenged conduct did not violate a constitutional right (the objective element) and the official undertook the challenged conduct in a good-faith belief that the conduct was valid (the subjective element). However, on further consideration, the Court in <u>Harlow v. Fitzgerald</u> stated, "[t]he subjective element of

the good-faith defense frequently has proved incompatible with our admonition in <u>Butz</u> that insubstantial claims should not proceed to trial." 457 U.S. 800, 815-16, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Therefore, the modern qualified immunity doctrine is viewed only through the lens of objective reasonableness. <u>Id.</u>, at 815-16, 102 S. Ct. 2727.[6]

Plaintiff here maintains that the individual Defendant Officers' actions amounted to excessive force, and the officers are not entitled to qualified immunity. The Court disagrees, and finds qualified immunity applicable. While the Court accepts <u>Pearson</u>'s invitation,[7] and concludes that the Defendants' actions were not objectively unreasonable under clearly established law, the Court also notes that whether the force was excessive is also questionable.

A plaintiff claiming excessive force must show: (1) an injury, (2) resulting directly from the excessive force, (3) that was clearly unreasonable. <u>Fontenot v. Cormier</u>, 56 F.3d 669, 675 (5th Cir.1995). "Excessive force cases based on tasing a suspect or detainee seem to divide themselves [ ] into two categories: (1) those that occur prior to the officers' obtaining control over a suspect, and (2) those that occur after a suspect has been subdued." <u>Buchanan v. Gulfport Police Dept.</u>, 2012 WL 1906523, at 9 (S.D. Miss. May 25, 2012); <u>see also</u>

---

[6] While qualified immunity focuses on objective conduct as opposed to subjective intent, the Supreme Court made clear in <u>Crawford-El v. Britton</u> that <u>Harlow</u> does not prohibit inquiry into a defendant's subjective intent when it pertains to an essential element of the alleged constitutional violation. 523 U.S. 574, 588-89, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998). <u>Crawford-El</u> was a First Amendment retaliation case where the defendant's intent was element of the claim. <u>Id.</u> Here, the Defendants' state of mind is irrelevant to the elements of Plaintiff's Fourth Amendment violation. Thus, <u>Crawford-El</u>'s limited allowance for inquiry into a defendant's state of mind is not at issue.

[7] As noted *supra*, <u>Pearson</u> undermined the mandatory sequential analysis set forth in <u>Saucier</u>. Under <u>Pearson</u>, courts may skip the first question entirely and instead begin by determining whether the conduct was objectively reasonable under clearly established law.

Cockrell v. City of Cincinnati, 2012 WL 573972, at *4-*5 (6th Cir. Feb. 23, 2012) (noting that "[c]ases addressing qualified immunity for taser use fall into two groups. The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers. . . [T]he second group of cases [involves] a law enforcement official tas[ing] a plaintiff who has done nothing to resist arrest or is already detained."). In the second group of cases, courts have almost uniformly held that a § 1983 excessive force claim is available. Cockrell, 2012 WL 573972, at *4-*5; Kijowski v. City of Niles, 372 F. App'x 595, 601 (6th Cir. 2010) (quoting Wysong v. City of Heath, 260 F. App'x 848, 856 (6th Cir. 2008)); Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009) (holding that tasing non-violent passenger during traffic stop for failure to hang up from 911 call violated clearly established law, as of October 2005); Landis v. Baker, 297 F. App'x 453 (6th Cir. 2008) (holding that repeated use of taser against subdued defendant lying face-down in swamp water violated clearly established law, as of November 2004); Casey, 509 F.3d 1278 (holding that officers' tasing compliant, non-violent misdemeanant violated clearly established law, as of August 2003); Buchanan, 2012 WL 1906523, at 9; Shekleton v. Eichenberger, 2011 WL 1578421 (N.D.Iowa Apr.26, 2011) (holding that tasing non-violent misdemeanant, who did not resist arrest, struggle with, or pose a threat to, officers, or attempt to flee, violated clearly established law, as of September 2008); Borton v. City of Dothan, 734 F.Supp.2d 1237 (M.D. Ala. 2010) (holding that tasing mentally disturbed patient who was not under arrest three times, even though she was secured to a gurney with handcuffs and restraints, was violation of clearly established law, as of August 2006); Orsak v. Metro. Airports Comm. Airport Police Dep't, 675 F.Supp.2d 944 (D.Minn. 2009) (holding that

officers who pulled cyclist from bike, stood him up, and shot him with taser may have violated clearly established law, as of September 2006); <u>Asten v. City of Boulder</u>, 652 F. Supp. 2d 1188 (D.Colo. 2009) (holding that "the unforewarned tasing of a mentally unstable woman [who was not under arrest] in her own home" violated clearly established law, as of October 2006).

"In the first category, where the suspect is resisting arrest or disobeying the officers' orders, tasing may not be considered excessive force." <u>Buchanan</u>, 2012 WL 1906523, at 9; <u>see also Cockrell</u>, 2012 WL 573972, at *4 ("In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident."); <u>Mattos v. Agarano</u>, 661 F.3d 433, 433   (9th Cir. 2010) (holding, in consolidated cases, that 2004 and 2006 taser deployments constituted excessive force, but did not violate clearly established law); <u>McKenney v. Harrison</u>, 635 F.3d 354 (8th Cir. 2011) (holding that 2007 taser deployment against misdemeanant who made sudden move toward window while being questioned by police and told not to "try anything stupid" did not constitute excessive force, even though misdemeanant fell out of window to his death after being tased); <u>Bryan v. MacPherson</u>, 630 F.3d 805, 805 (9th Cir. 2009) (holding that 2005 taser deployment against motorist yelling angrily and acting erratically after traffic stop for failing to wear seatbelt violated Fourth Amendment, but not clearly established law); <u>Baird v. Ehlers</u>, 2011 WL 5838431 (W.D. Wash. Nov. 21, 2011) (holding that using taser three times on man who, in "drunken stupor," was physically removed from city bus, and engaged in verbal and physical confrontation with officer, may have been excessive use of force, but that law regarding taser use was not clearly

established as of November 2009); Carter v. City of Carlsbad, 2011 WL 2601027 (S.D. Cal. June 30, 2011) (holding that use of taser against large, belligerent, drunken ex-marine who "took an offensive fighting stance" may have been excessive, but did not violate clearly established law on October 31, 2009); Azevedo v. City of Fresno, 2011 WL 284637 (E.D. Cal. Jan. 25, 2011) (holding that use of taser against suspect detained during investigation of burglary, who fled after being asked about weapons then was warned to stop, may have violated Fourth Amendment, but did not violate clearly established law, as of November 2007); Sanders v. City of Dothan, 671 F. Supp. 2d 1263 (M.D. Ala. 2009) (holding that officer who tased detained, but uncooperative, suspect using drive-stun mode did not violate clearly established law, as of August 2005); Beaver v. City of Federal Way, 507 F. Supp. 2d 1137 (W.D. Wash. 2007) (holding that, of five August 2004 taser deployments against suspect who fled scene of residential burglary and refused to obey command to stop, first three were not excessive uses of force, since officer had to make split-second decisions on how to subdue disobedient, fleeing felon, while last two constituted excessive force because suspect was no longer immediate threat; qualified immunity still was appropriate, however, because law was not clearly established).

Given the circumstances in this case, where Williams fled the scene with drugs in hand, was non-compliant, was warned about being tased and ignored the warning, remained unfazed after being tased, and physically struggled with both individual Defendant officers, the Court is unable to say the force used was excessive.[8]

_____

[8] "In assessing whether the use of force was reasonable, [the court] must assess the totality of the circumstances. Several important factors are the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

However, even if the totality of the force utilized amounted to excessive force, Defendants would still be entitled to qualified immunity. "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al- Kidd, 131 S. Ct. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)) (internal quotation marks omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). Existing case law from our circuit and others, guidance from experts in a field, and even "[t]he obvious cruelty inherent in [a] practice" can contribute to the conclusion that an act was so aberrant that every reasonable official would have understood that it was unconstitutional. See id. at 741–46. "The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." Casey, 509 F.3d at 1284. Without question, the use of objectively unreasonable force violates the Fourth Amendment. Id. (citing Graham, 490 U.S. at 395, 109 S. Ct. 1865). The Supreme Court, however, has

> repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.

---

whether he is actively resisting arrest or attempting to evade arrest by flight." Massey v. Wharton, 2012 WL 2004968, at *5 (5th Cir. June 5, 2012) (internal quotations and citations omitted).

al- Kidd, 131 S.Ct. at 2084 (internal citations omitted). "In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear which uses of force are unreasonable." Casey, 509 F.3d at 1284 (emphasis in original).

Taking this into account, the Court concludes that the individual Defendants' actions were not objectively unreasonable in light of clearly established law at the time of the incident. See Cockrell, 2012 WL 573972, at *5-6. As it relates to taser usage, the Sixth Circuit in Cockrell very recently noted as follows:

> The most we can draw from today's case law, in summary, is this: in no case where courts denied qualified immunity was the plaintiff fleeing, and in at least some of these cases, the court specifically referred to the fact of non-flight . . . These broad principles do not establish the contours of the right Hall allegedly violated so clearly that every reasonable officer would know his actions were unconstitutional, even today. It certainly did not do so in July 2008.

> Neither does guidance from outside sources show that Hall's actions were objectively unreasonable. The district court emphasized that the Department of Justice and other law-enforcement agencies nationwide "have determined that the use of a taser against a non-violent suspect who is fleeing on foot creates a risk of serious injury and recommend that such use be prohibited or discouraged." It also noted that the manufacturer of the device, TASER International, "warned that the use of the device against individuals who are running can cause serious injury or death." . . . Taser deployment has a margin of safety as great or greater than most alternatives, and carries a significantly lower risk of injury than physical force." Ibid. (citing John H. Laub, Director, Nat'l Inst. of Justice, Study of Deaths Following Electro Muscular Disruption 30–31 (2011)). Of course, the materials the district court cited focus specifically on suspects fleeing from law enforcement. But this does not diminish the force of arguments concerning tasers' relative safety, as compared to other methods of detaining suspects—even suspects who are running from the police. See ibid. (discussing dangers of alternative methods of subduing suspects). Data from outside sources, then, confirms our analysis of taser-use case law: it is not clear that every reasonable officer would believe that Hall's actions violated Cockrell's right to be free from excessive force.

> Finally, there is no "obvious cruelty inherent" in the use of tasers, Hope, 536 U.S. at 745, which would render Hall's conduct objectively unreasonable. Tasers in general . . . involve a significant degree of force. As Judge Murphy of

the Eighth Circuit observed: "especially with the newer tasers, the nature and quality of their intrusion on the individual's Fourth Amendment interests is somewhat unique in that they render even the most pain tolerant individuals utterly limp." McKenney, 635 F.3d at 362 (Murphy, J., concurring) . . . However, argues Ninth Circuit Chief Judge Kozinski, even if tasers do involve a significant degree of force, they are a highly desirable and extremely effective law-enforcement tool. They allow an officer to deter an uncooperative suspect from a safe distance, without undue risk to either party. Mattos, 661 F.3d at 453–54 (Kozinski, C.J., concurring in part and dissenting in part). We take no position on the merits of any judge's argument; nor do we need to do so. It is enough to say that such a difference of opinion among reasonable jurists demonstrates that taser use is not so inherently cruel that it is objectively unreasonable on that basis alone.

Id. In Cockrell, the Court concluded a police officer was entitled to qualified immunity when an individual brought an action alleging that the officer's use of a taser on him when he was merely fleeing from the scene of a non-violent misdemeanor constituted excessive force. Id. In that case, the individual did not use violence, did not make threats, and never even disobeyed a command to stop. Nevertheless, the Court found that even "flight, as non-violent though it may be, is still a form of resistance." Id. at *6. The Court, after an in-depth analysis, concluded that qualified immunity was appropriate.

Similarly, two recent consolidated cases out of the Ninth Circuit are instructive on taser usage and qualified immunity. See Mattos v. Agarano, 661 F.3d 433 (9th Cir. 2011). The two cases analyzed in Mattos presented questions of whether the use of a taser to subdue suspects resulted in the excessive use of force and whether the officers are entitled to qualified immunity. In Brooks v. City of Seattle, Plaintiff Malaika Brooks was tased; in Mattos v. Agarano, Jayzel Mattos was tased. Both women were tased during an encounter with police officers.

In Brooks, Malaika Brooks was driving her eleven–year–old son to school in Seattle, Washington. Brooks was thirty-three years old and seven months pregnant at the time. The street on which Brooks was driving had a thirty-five–mile–per–hour posted speed limit until the school zone began, at which point the speed limit became twenty miles per hour. When Brooks entered the school zone, she was driving thirty-two miles per hour. Once in the school zone, a Seattle police officer parked on the street measured Brooks's speed with a radar gun, found that she was driving faster than twenty miles per hour, and motioned for her to pull over.  Once Brooks pulled over, Seattle Police Office Juan Ornelas approached her car. Ornelas asked Brooks how fast she was driving and then asked her for her driver's license. Brooks gave Ornelas her license and then told her son to get out of the car and walk to school, which was across the street from where Ornelas had pulled her car over. Ornelas left, returning five minutes later to give Brooks her driver's license back and inform her that he was going to cite her for a speeding violation. Brooks insisted that she had not been speeding and that she would not sign the citation. At this, Ornelas left again.

Soon after, Officer Donald Jones approached Brooks in her car and asked her if she was going to sign the speeding citation. Brooks again refused to sign the citation but said that she would accept it without signing it. Jones told Brooks that signing the citation would not constitute an admission of guilt; her signature would simply confirm that she received the citation. Brooks told Jones that he was lying, the two exchanged heated words, and Jones said that if Brooks did not sign the citation he would call his sergeant and she would go to jail. A few minutes later, Sergeant Steven Daman arrived at the scene and he, too, asked Brooks if she would sign the citation. When Brooks said no, Daman told Ornelas and Jones to "book

her." Ornelas told Brooks to get out of the car, telling her that she was "going to jail" and failing to reply when Brooks asked why. Brooks refused to get out of the car. At this point, Jones pulled out a taser and asked Brooks if she knew what it was. Brooks indicated that she did not know what the taser was and told the officers, "I have to go to the bathroom, I am pregnant, I'm less than 60 days from having my baby." Jones then asked how pregnant Brooks was. Brooks's car was still running at this point. After learning that Brooks was pregnant, Jones continued to display the taser and talked to Ornelas about how to proceed. One of them asked "well, where do you want to do it?" Brooks heard the other respond "well, don't do it in her stomach; do it in her thigh." During this interchange, Jones was standing next to Brooks's driver's side window, Ornelas was standing to Jones' left, and Daman was standing behind them both. After Jones and Ornelas discussed where to tase Brooks, Ornelas opened the driver's side door and twisted Brooks's arm up behind her back. Brooks stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from the car. While Ornelas held her arm, Jones cycled his taser, showing Brooks what it did. At some point after Ornelas grabbed Brooks's arm but before Jones applied the taser to Brooks, Ornelas was able to remove the keys from Brooks's car ignition; the keys dropped to the floor of the car. Twenty-seven seconds after Jones cycled his taser, with Ornelas still holding her arm behind her back, Jones applied the taser to Brooks's left thigh in drive-stun mode. Brooks began to cry and started honking her car horn. Thirty-six seconds later, Jones applied the taser to Brooks's left arm. Six seconds later, Jones applied the taser to Brooks's neck as she continued to cry out and honk her car horn. After this third tase, Brooks fell over in her car and the

officers dragged her out, laying her face down on the street and handcuffing her hands behind her back.

The Ninth Circuit went into an extensive analysis of the factual allegations and the pertinent case law addressing the issues. As it relates to the "first" prong of the qualified immunity analysis, the court found that plaintiff could establish a constitutional violation. Id. The court noted that the alleged offenses were very minor; the plaintiff did not pose an immediate threat to the safety of the officers or others; while she resisted arrest, the plaintiff did not evade arrest by flight; no other exigent circumstances existed at the time; and the officer tased the plaintiff three times over the course of less than one minute. Id. at 445-46. Nevertheless, the Ninth Circuit still concluded that the officers were entitled to qualified immunity because the law was not clearly established. Id. at 448.

Next, the Ninth Circuit addressed the factual allegations presented in Mattos v. Agarano. In that case, Jayzel Mattos and her husband Troy had a domestic dispute which escalated and Jayzel asked her daughter to call the police. Several minutes later, the police arrived at the Mattoses' residence, and they saw Troy sitting on the top of the stairs outside the front door with a couple of open beer bottles lying nearby. One of the officers informed Troy of the 911 call, and asked Troy if he could speak to Jayzel to ensure that she was okay. When Troy went inside to get Jayzel, one of the officers stepped inside the residence behind him. After Troy returned with Jayzel, he became angry when he saw the officer inside his home. Jayzel was initially standing behind Troy, but she ended up in front of him on her way to the front door to speak with the officers. Troy began yelling at the officer to get out of his residence because he had no right to be inside; the same officer asked Jayzel if he could speak

to her outside. Jayzel agreed to go outside, but before she could comply with the officer's request, another officer entered the residence, stood in the middle of the living room, and announced that Troy was under arrest. At this time, Jayzel was already standing in front of Troy and she did not immediately move out of the way. As the officer moved in to arrest Troy, he pushed up against Jayzel's chest, at which point she "extended [her] arm to stop [her] breasts from being smashed against [the officer's] body." The officer then asked Jayzel, "Are you touching an officer?" Simultaneously, Jayzel was attempting to diffuse the situation by asking why Troy was being arrested and telling everyone to calm down. Without warning, the officer attempting to arrest Troy shot his taser at Jayzel in dart-mode. Jayzel "felt an incredible burning and painful feeling locking of [her] joints [and] muscles and [she] f[e]ll hard on the floor." Troy was then handcuffed, and both Troy and Jayzel were taken into custody and charged; the charges were ultimately dropped.

The Ninth Circuit began its analysis of the <u>Mattos</u> case much like the court did in its analysis of <u>Brooks</u>. In addressing whether Mattos could state a constitutional violation, the Court noted that the officer used the "intermediate force of a taser in dart-mode" on Jayzel when her offense was "minimal at most." She posed no threat to the officers, and she only minimally resisted Troy's arrest while attempting to protect her own body and comply with the another officer's request that she speak to him outside. The court noted that Jayzel was only minimally culpable for the escalation of the situation, and she was tased without warning. The court concluded that, when viewed in the light most favorable to the plaintiff, "a reasonable fact finder could conclude that the officers' use of force against Jayzel, as alleged, was constitutionally excessive in violation of the Fourth Amendment." <u>Id.</u> at 451.

Yet, the court concluded that, while the Mattoses had alleged a constitutional violation, "not every reasonable officer at the time of the [ ] incident would have known—beyond debate—that such conduct violates the Fourth Amendment." Thus, as was the case in Brooks, the officers in Mattos were found to be entitled to qualified immunity.[9]

In contrast to these cases, the Fifth Circuit recently denied qualified immunity in a case in which a taser was utilized. See Massey v. Wharton, 2012 WL 2004968 (5th Cir. June 5, 2012). In that case, police officers engaged in a high-speed chase of a fleeing motorist, Chad Gammons. Id. at *1. As Gammons neared Olive Branch city limits, the DeSoto County Sheriff's Department was notified that Gammons was heading into the county. Id. Defendant Robert Wharton, a deputy of the Desoto County Sheriff's Department, was on duty that night and responded to the dispatch. Id. Eventually, Gammons ran off the road and crashed into the side of a house occupied by Essie Talley, the mother of plaintiff Tonia Massey and the grandmother of plaintiff Greg Massey. Id. After the crash, both DeSoto County Sheriff's Department officers and Olive Branch police officers were at the scene. Id. According to the plaintiffs, Greg Massey who lived nearby, drove an all-terrain vehicle (ATV) to Talley's house in order to survey the damage resulting from the crash. Id. Multiple police officers testified that Massey was moving at a high rate of speed. Id. Greg Massey asserts that when he arrived on the scene, he began talking to Tonia Massey, his mother, and Talley, his grandmother. Id. He claims that Wharton told him to get off the ATV but another officer yelled at him to drive it away and park it elsewhere. Id. Wharton fired his taser at Greg

_____

[9] See also Clark v. Ware, 2012 WL 1994788 (E.D. Mo. June 4, 2012) (case in which the plaintiff was repeatedly tased after struggling with officers, the court found qualified immunity was still appropriate and, after collecting cases, noted that "the case law related to taser use is still developing" and the officers' conduct did not violate clearly established law).

almost immediately afterward. Id. According to the plaintiffs, Greg did not say anything to Wharton before Wharton fired his taser, nor did Greg engage in any kind of physical altercation with Wharton. Id. Greg testified that after Wharton deployed his taser, he told Greg to drive the ATV up the hill and park it by his parents' home. Greg began to drive away slowly, but Wharton persisted in the altercation and attempted to spray Greg with pepper spray. Id. After being sprayed, Greg asserts that he continued up the hill, consistent with the officers' instructions. Id. Wharton and other officers gave chase. At the top of the hill, Wharton allegedly deployed his taser again. Id. Greg was then pulled off of the ATV, handcuffed, and arrested. Id. Greg was taken to jail on charges of disorderly conduct and resisting arrest, both misdemeanor charges, which were subsequently dismissed. Id.

The Fifth Circuit in Massey found qualified immunity not to be applicable. Id. at *5. The Court noted that Greg Massey was arrested for disorderly conduct and resisting arrest although he was attempting to comply with the officers' commands, he was not a threat to the officers or others, and he was not attempting to flee, but was driving away at the command of Wharton. Nonetheless, Wharton used his taser twice and his pepper spray once to subdue Greg. Id. The court relied on previous case law involving a taser found in Austin v. Bayton, 174 F. App'x 183 (5th Cir. 2005). In Austin, the plaintiff, suspecting something was wrong, used a brick to knock on the door of her brother's house. Id. at 183. When he did not answer, she called the police and requested an officer's help. Id. at 184. The officer arrived and told her he could not help her, and as she picked up the brick and approached the door again, the officer deployed his taser on her. Id. It malfunctioned, so he attempted a contact tase. Id. The taser malfunctioned again. Id. He repeatedly contact tased the plaintiff while forcing her to

the ground. Id. She hit her head on a pole and suffered a laceration. Id. The Fifth Circuit affirmed the district court's denial of the officer's motion for summary judgment "because the plaintiff was at most committing the minor crime of criminal mischief, was not a threat to the officer or others, and was not resisting arrest." Id. at 185. Because none of the factors above supported the officer, the court held that the officer was not entitled to qualified immunity. Id. at 186.

In this case, unlike the cases in which qualified immunity has been denied, Jermaine Williams fled the scene and ran from the individual Defendant officers with at least one bag of crack cocaine in his hands.[10] Officer Perry yelled at Jermaine Williams to stop, and told Williams that if he did not stop, he would use his Taser ECD. Williams ignored such warnings and continued to run towards Officer Perry; thus, Officer Perry deployed his Taser

_____

[10] Plaintiff makes several allegations in his response in opposition to summary judgment based on qualified immunity concerning alleged "racial profiling, failure to secure evidence . . . [and] failure to provide an adequate investigation." The Court is not quite sure how allegations concerning racial profiling and an incident not even involving the deceased and occurring a week prior supports Plaintiff's Section 1983 *excessive force* claim. Along the same lines, the Court is not quite sure how allegations concerning an alleged failure to secure evidence constitute excessive force. The Court has nonetheless considered all of Plaintiff's arguments and finds qualified immunity to still be appropriate.

Along the same lines, Plaintiff also asserts that the individual officers are not entitled to qualified immunity because they caused Williams to suffer from "positional asphyxia," and because Williams was placed in a choke hold. To begin with, there is ***no*** allegation in Plaintiff's complaint concerning a choke hold or that Williams suffered from positional asphyxia. Instead, Plaintiff's complaint states as follows: "As a direct result of being 'tasered' multiple times, Jermaine Williams suffered cardiac arrhythmia and/or respiratory seizures thereby resulting in his death." Thus, Plaintiff's allegations in the complaint concern only the utilization of Taser ECDs and that the deployment of the Taser ECDs allegedly caused Williams' death. Nonetheless, the Court has combed through the entire action in this case, and has found no evidence that Williams suffered from positional asphyxia or that any alleged choke hold resulted in his death. Moreover, the Court has carefully considered Plaintiff's arguments concerning such allegations and has concluded that qualified immunity is still appropriate under the circumstances presented in this case.

ECD in probe mode. Even after Officer Perry deployed his Taser ECD, Williams continued to physically struggle and attempted to disarm with both Officer Perry and Officer Goza. The assistance of other officers was required to gain control of Williams and place handcuffs on him. Once Williams was handcuffed, the force utilized ceased. Even assuming, *arguendo,* that the use of any such force by the officers was excessive, the officers are entitled to qualified immunity, as the Court finds that the conduct did not violate clearly established statutory or constitutional law of which a reasonable person would have aware.[11] Accordingly, the Defendant officers' motion for summary judgment is granted.

C. Motion for Summary Judgment filed by the City of Cleveland

**Municipal Liability under Section 1983**

---

[11] The Court also notes that Plaintiff entirely failed to brief in his response in opposition to summary judgment the "second" prong of the qualified immunity analysis. That is, Plaintiff's brief states as follows:

> Going back to the threshold question set forth in Saucier, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" As shown above by the opinions and testimony of Dennis Waller and Ernest Burwell, the resounding answer is yes, a reasonable jury can conclude that the officers' conduct violated the constitutional rights of Jermaine Williams. Therefore, the Municipal Defendants' are not entitled to qualified immunity and their Motion for Summary Judgment must fail.

Plaintiff's brief only addresses whether a constitutional violation occurred; it fails to address whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. See In re Cao, 619 F.3d at 435 (noting that the role of the Court is "not to create arguments for adjudication" or "raise [them] like a Phoenix from the ashes[,]" but "rather, [the Court's] role is to adjudicate the arguments with which [it is] presented"); Williams, 432 F. App'x at 303 (noting that the district court is "not required to search the record in support of evidence supporting a party's opposition to summary judgment"); Cinel,15 F.3d at1345 ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

A municipality is a "person" subject to suit under Section 1983. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A local government entity may be sued "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 121, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (quoting Monell, 436 U.S. at 690, 98 S. Ct. 2018). Alternatively, municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. Monell, 436 U.S. at 690-91, 98 S. Ct. 2018. "[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) (citation omitted).

The elements of the Monell test exist to prevent a collapse of the municipal liability inquiry into a respondeat superior analysis. See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 415, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). A municipality may not be subject to liability merely for employing a tortfeasor. See, e.g., City of Canton, Ohio v. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). Municipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation. Id. at 391-92, 109 S. Ct. 1197.

*1. Municipal Liability – Policymaker*

"The **first requirement** for imposing municipal liability is proof that an official policymaker with actual or constructive knowledge of the constitutional violation acted on

behalf of the municipality." <u>Zarnow v. City of Witchita Falls, Tex.</u>, 614 F.3d 161, 167 (5th Cir. 2010) (citing <u>Cox v. City of Dallas, Tex.</u>, 430 F.3d 734, 748-49 (5th Cir. 2005) (emphasis added)). A policymaker is "one who takes the place of the governing body in a designated area of city administration." <u>Webster v. City of Houston</u>, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). He or she must "decide the goals for a particular city function and devise the means of achieving those goals." <u>Bennett v. City of Slidell</u>, 728 F.2d 762, 769 (5th Cir. 1984) (en banc).

In this case, Plaintiff has entirely failed to identify or mention an official policymaker. Instead, Plaintiff merely refers to the "City of Cleveland" as the policymaker. That is, Plaintiff never argues that the Chief of Police, or the Mayor, or any member of the Board of Alderman for the City of Cleveland serve as the policymaker in this action. It is also undisputed that none of these individuals were present when this incident occurred. Yet, because the Court concludes that Plaintiff has also otherwise failed to demonstrate a claim of municipal liability, the Court further analyzes each of Plaintiff's arguments on their merits.

### 2. *Municipal Liability – Official Policy or Custom*

The Court must next consider whether the allegedly unconstitutional action constitutes a "custom or policy" of the municipality. The Fifth Circuit has identified two forms that "official policy" may take. First, a plaintiff may point to a policy statement formally announced by an official policymaker. <u>See</u> <u>Webster</u>, 735 F.2d at 841. In the alternative, the plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." <u>Id.</u>

Plaintiff's first theory of municipal liability is that there is a policy of inadequate training. "A municipality's failure to train its police officers can without question give rise to § 1983 liability." World Wide Street Preachers Fellowship v. Town of Columbia, 591 F.3d 747, 756 (5th Cir. 2009) (citations omitted). However, when a plaintiff seeks to impose § 1983 liability on a municipality for its failure to train its employees, normal tort standards are replaced with heightened standards of culpability and causation. City of Canton, 489 U.S. at 391, 109 S. Ct. 1197. To prevail on a "failure to train theory," a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question. World Wide Street Preachers Fellowship, 591 F.3d at 756.

The Court addresses each of Plaintiff's arguments in turn. First, Plaintiff maintains that the "officers failed to secure evidence…." Plaintiff maintains that its "experts" stated that "the officers' failure to do so goes against training which the officers should have received." Second, Plaintiff maintains that "Williams was left in a prone position with his arms handcuffed behind his back . . . [and that] this conduct goes against the proper standards of training which should have been received by these officers." Plaintiff does not discuss these issues any further under his failure to train theory of municipal liability. That is, the brief "does not reference any evidence concerning the procedures used to train the officers [as related to the securing of evidence or leaving an individual in prone position]." See Zarnow, 614 F.3d at 170. There is no allegation made with specificity as to what the City of Cleveland's training program entails as related to these issues or specifically how the training

program as to these issues is defective. See Roberts v. City of Shreveport, 397 F.3d 287, 293 (5th Cir. 2005) (noting that in order for "liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective").

Third, Plaintiff maintains that "Williams was placed in a choke hold during apprehension . . .[and that] [t]his is directly contrary to the express terms of the policy and procedures for the City of Cleveland Police Department and exhibits clearly that the officers were not properly trained in accordance with the City's policies." Plaintiff, again, fails to allege with any specificity how the training programs for the City are defective. In fact, Plaintiff concedes that the City of Cleveland set forth policies concerning the use of choke holds. It does not automatically follow that the officers were inadequately trained merely because Plaintiff alleges that they acted contrary to City policies. If such were the case, municipalities would be liable each and every time it was alleged that a city employee violated a policy promulgated by a city. Yet, the elements of the Monell test exist to prevent a collapse of the municipal liability inquiry into a respondeat superior analysis. See Brown, 520 U.S. at 415, 117 S. Ct. 1382. A municipality may not be subject to liability merely for employing an alleged tortfeasor. See, e.g., City of Canton, 489 U.S. at 392, 109 S. Ct. 1197.

Fourth, Plaintiff bases its failure to train theory of municipal liability on the City's alleged failure to train officers in the use of Taser electronic weapons. As it relates to Taser usage, Plaintiff appears to rely on a single incident theory (i.e., the utilization of the Taser on Jermaine Williams) to prove his claim, as well as allege that the City maintains an unconstitutional custom or practice. The Court addresses both of these issues, beginning with the single incident theory of municipal liability.

"The single incident exception . . . is a narrow one, and one that [the Fifth Circuit has] been reluctant to expand." Burge v. St. Tammany Parish, 336 F.3d 363, 373 (5th Cir.2003) (citing Pineda v. City of Houston, 291 F.3d 325, 334-35 (5th Cir. 2010)). That is, claims of inadequate training generally require that the plaintiff demonstrate a pattern. Davis v. City of N. Richland Hills, 406 F.3d 375, 383 n. 34 (5th Cir. 2005) (citation omitted); see also Lewis v. Pugh, 289 F. App'x 767, 772 (5th Cir. 2008) (citing Thompson v. Upshur County, 245 F.3d 447, 458 (5th Cir. 2001) ("Proof of more than a single instance . . . is required before such a lack of training can constitute deliberate indifference.")). Indeed, Plaintiff must "demonstrate that the municipality or supervisor had notice of a pattern of prior acts fairly similar to what ultimately transpired." Lewis, 289 F. App'x at 772 (internal citations omitted).

The Fifth Circuit has considered single violation liability several times, and, "with only one exception in some thirty years since Monell, has 'consistently rejected application of the single incident exception.'" Thompson v. Connick, 578 F.3d 293, 299 (5th Cir. 2009) (citing Gabriel, 202 F.3d 741, 745 (5th Cir. 2000)); see also Cozzo v. Tangipahoa Parish Council-President Government, 279 F.3d 273, 288 (5th Cir. 2002) ("[T]his court has often rejected application of the single incident exception."); Snyder v. Trepagnier, 142 F.3d 791, 798 (5th Cir. 1998) ("[P]roof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training."). The sole exception, Brown v. Bryan County, involved a failure to train a neophyte on the constitutional limits to the use of force. 219 F.3d 450 (5th Cir. 2000). The facts of Brown demonstrate that single violation liability applies only in extreme circumstances. In Brown, the offending officer was the sheriff's nephew who had been on the job for only a few weeks and had no education or experience whatsoever in

law enforcement. Id. at 458. Moreover, shortly before joining the sheriff's office, he had been arrested for several crimes, including assault and battery. Id. at 454.

Here, the officers involved in this incident had all been trained according to state standards, and the training was current. "[The Fifth Circuit] consider[s] compliance with state requirements as a factor counseling against a 'failure to train' finding." Zarnow, 614 F. App'x at 171; see also Conner v. Travis Cnty., 209 F.3d 794, 798 (5th Cir. 2000). Likewise, the Fifth Circuit has explained that when officers have received training as required by state law, the plaintiff must show that the legal minimum of training was inadequate. See Benavides v. Cnty. of Wilson, 955 F.2d 968, 973 (5th Cir. 1992). Such evidence has not been presented in this case. Further, the City of Cleveland maintains that Officers Perry and Goza were both provided with specialized training in the use of the Taser X26 Electronic Control Device prior to the incident giving rise to this action. See McIntosh v. Smith, 690 F. Supp. 2d 515, 536 (S.D. Tex. 2010) (noting, in a failure to train case, that the municipal defendant submitted evidence showing that the officers attended taser training courses). Moreover, "'that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city.'" Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390-391, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). Rather, the "vigorous test" of "deliberate indifference," Brown, 219 F.3d at 461, is required because a "lesser standard of fault would result in de facto respondeat superior liability on municipalities-a result [the Supreme Court] rejected in Monell." Canton, 489 U.S. 378, 379, 109 S. Ct. 1197.

As the court noted in Brown, liability for failure to train "depends upon whether it should have been obvious . . . or . . . whether [there was] sufficient notice [ ] that the failure

to train . . . was likely to lead to a violation of the Fourth Amendment."  219 F.3d at 460.

While a single incident may serve as the basis of liability, "that violation [must be] an obvious

consequence of the failure to train."  Id.

Plaintiff here has not presented evidence that "the risk of injury to citizens was the

obvious, highly predictable consequence of a lack of taser training." McIntosh, 690 F. Supp.

2d at 536 (internal quotations omitted).  That is, "Plaintiff has not shown that the City had any

notice, much less 'sufficient notice,' that tasers had previously resulted in [death]." Id.

(quoting Brown, 219 F.3d at 458, 460).  Moreover, Plaintiff has not proffered evidence that

the officers involved in this action have been accused of unreasonable or excessive force prior

to this incident.  However, Plaintiff does attempt to show a custom or practice on behalf of the

City of Cleveland concerning taser usage. The Court thus now turns to and addresses those

arguments.

As noted, municipal liability will only attach if the municipality was *deliberately

indifferent* to the constitutional rights of citizens. City of Canton, 489 U.S. at 388 & n.7, 109

S. Ct. 1197.  Errors of judgment do not alone prove deliberate indifference, nor is such

heightened culpability established simply by showing that a municipality could have ordered

more or different training or even misjudged whether training was necessary. The Fifth

Circuit has held that "'deliberate indifference' is a stringent standard of fault, requiring proof

that a municipal actor disregarded a known or obvious consequence of his action," and that

"for an official to act with deliberate indifference, the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." Estate of Davis ex rel. McCully v. City of North Richland

Hills, 406 F.3d 375, 381 (5th Cir. 2005). (citations and internal quotation marks omitted). Additionally, "[d]eliberate indifference requires a showing of more than negligence or even gross negligence," and "[t]o satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." Id. (citations and quotations marks omitted).

Plaintiff contends that "[t]he use of force reports produced by the City of Cleveland demonstrates a very disturbing trend – that African American males, the vast majority of which are in their twenties, are being tased by officers of the Cleveland Police Department on a systematic basis during apprehension." Plaintiff further maintains that "during the time period between May 29, 2010 and July 19, 2010 eight (8) individuals were tased by officers of the Cleveland Police Department. Including the tasing of Jermaine, nine (9) individuals were tased from May 29th until July 23rd. Each of these individuals was African American and each were tased under very similar circumstances." Plaintiff thus argues that this rises to the level of a persistent and widespread practice. The Court finds Plaintiff has not met its burden of establishing municipal liability. First, Plaintiff provides no other factual background as it relates to the tasing of the aforesaid African American individuals. The tasing of such individuals thus could have been entirely proper under the circumstances. That is, the tasing could have been constitutionally acceptable. The mere deployment or utilization of a taser does not automatically equate to a violation of the Fourth Amendment. If the aforementioned tasing incidents all pass constitutional muster, then such incidents do not established an "*un*constitutional" custom or policy on behalf of the City of Cleveland.

Second, as to the racial allegations proffered, Plaintiff has failed to identify the number of African Americans tased in relation to the number of Caucasians or other races. Moreover, Plaintiff has failed to provide population statistics—if the City's population is majority African American, it would stand to follow that police officers would encounter more African Americans than other races. Plaintiff simply has failed to set forth evidence that is legally sufficient to support a finding of deliberate indifference. In other words, there is no evidence demonstrating that a policymaker (one in which Plaintiff has failed to identify) or the City of Cleveland has "made a deliberate or conscious choice to endanger constitutional rights." Lewis, 289 F. App'x at 772-73. Accordingly, summary judgment is appropriate as to this claim.

**Official Capacity Claims Against Officers**

Plaintiff has also sued the officers in their official capacities. An official capacity claim is merely another way of pleading an action against the entity of which the individual defendant is an agent. See Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). Plaintiff's allegations against the officers in their official capacities are essentially claims against their employer, the City. See id. Because the factual basis for Plaintiff's official capacity claims against the officers is the same as that for his claims against the City, his official capacity claims against the officers are duplicative of his claims against the City and should be dismissed for the same reasons. See Castro Romero v. Becken, 256 F.3d 349, 255 (5th Cir. 2001) (finding dismissal of claims against officers in their official capacities appropriate when the "allegations duplicate claims against the respective governmental entities themselves").

***State Law Claims***

In his complaint, Plaintiff also alleges claims under Mississippi state law. Yet, Plaintiff utterly failed to brief in his response in opposition to summary judgment such state law claims. The Court thus considers these claims abandoned. See In re Cao, 619 F.3d at 435 (noting that the role of the Court is "not to create arguments for adjudication" or "raise [them] like a Phoenix from the ashes[,]" but "rather, [the Court's] role is to adjudicate the arguments with which [it is] presented"); Williams, 432 F. App'x at 303 (noting that the district court is "not required to search the record in support of evidence supporting a party's opposition to summary judgment"); Cinel, 15 F.3d at 1345 ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

Nevertheless, the Court notes that the Mississippi Tort Claims Act immunizes governmental entities and their employees for any act or omission of an employee engaged in activities relating to police or fire protection "unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." MISS. CODE ANN. § 11–46–9(1)(c) (Supp. 2011); Giles v. Brown, 962 So. 2d 612, 615–16 (Miss. Ct. App. 2006). The Mississippi Supreme Court has described "reckless disregard" as a higher standard than gross negligence, but less than intent. City of Jackson v. Law, 65 So. 3d 821, 826 (Miss. 2011). The term "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." Miss. Dep't of Pub. Safety v. Durn, 861 So. 2d 990, 995 (Miss. 2003). Similar to an excessive force claim under § 1983, the determination of whether there was reckless disregard will depend upon the

circumstances surrounding the incident that caused the injury. Scott v. City of Goodman, 997 So.2d 270, 277 (Miss. Ct. App. 2008). Additionally, if a defendant raises, as a defense, the allegation that the plaintiff was engaged in criminal activity, that activity must have "some causal nexus to the wrongdoing of the tortfeasor." City of Jackson v. Powell, 917 So. 2d 59, 69–70 (Miss. 2005). The criminal activity must occur contemporaneously with the injury; it is not sufficient that his earlier conduct was criminal. City of Jackson v. Calcote, 910 So. 2d 1103, 1111 (Miss. Ct. App. 2005).

Here, the Defendants argue that Jermaine Williams was undisputedly engaged in criminal activity at the time of his confrontation with the officers. Williams was a parolee who had cocaine in his system and in his possession at the time of his confrontation with the officers. Williams was also resisting arrest and entered into a physical altercation with the officers. Moreover, the Court finds that officers' conduct does not rise to the level of reckless disregard as defined by the Mississippi Supreme Court. Accordingly, the Court dismisses Plaintiff's state law claims asserted against the City and the individual police officers.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [122, 127, 129] shall be granted.[12]

SO ORDERED, this the 21st day of August, 2012.

/s/ Sharion Aycock
U.S. DISTRICT JUDGE

---

[12] Given the Court's ruling on summary judgment, Plaintiff's motion for reconsideration [166] is moot. Further, Defendant's motions to strike are also moot. The Court has methodically considered all of the arguments made at summary judgment stage, and finds that summary judgment is appropriate irrespective of any rulings on such motions to strike.